Revised January 18, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No.  00-20770
_____


JUAN E. VELA; ET AL

                              Plaintiffs

PHILLIP E. DALEY; TIERA ANGELLE LEGER; RICHARD WAYNE
MEDEIROS; CLINT HENDRIX

                              Plaintiffs - Appellants -
                              Cross-Appellees

        and

CALVIN THAMES, ET AL

                              Intervenor Plaintiffs

CALVIN THAMES, ET AL

                              Intervenor Plaintiffs-
                              Appellants - Cross-Appellees

        v.

THE CITY OF HOUSTON

                              Defendant - Appellee - Cross-
                              Appellant

_____

PHILIP E DALEY; TIERA ANGELLE LEGER; RICHARD WAYNE MEDEIROS;
CLINT HENDRIX

                              Plaintiffs – Appellants –
                              Cross-Appellees

        v.

CITY OF HOUSTON

                              Defendant – Appellee – Cross-
                              Appellant

_____

        Appeal from the United States District Court
            for the Southern District of Texas
_____

                December 14, 2001

Before KING, Chief Judge, BARKSDALE, Circuit Judge, and NOWLIN, District Judge.[*]

KING, Chief Judge:

In district court, Plaintiffs-Appellants asserted claims against Defendant-Appellee, the City of Houston, for overtime compensation pursuant to the Fair Labor Standards Act, and they now appeal from the district court's grant of summary judgment in favor of the City. The City cross-appeals from, among other things, the district court's award of attorney's fees in a related case that was consolidated with this case. For the following reasons, we REVERSE the district court's grant of summary judgment in favor of the City and REMAND for entry of judgment in favor of Plaintiffs-Appellants following a determination of the amount of overtime compensation owed by the City to Plaintiffs-Appellants. Further, we AFFIRM the district court's award of attorney's fees in the related case.

## I.  Factual and Procedural History

Plaintiffs-Appellants (the "Daley Plaintiffs") are paramedics and emergency medical technicians ("EMTs") (collectively the "EMS workers" or "EMS employees") employed by the City of Houston Fire Department. The Daley Plaintiffs are a subset of a group of approximately 2,600 fire department

---

[*]    District Judge of the Western District of Texas, sitting by designation.

employees consisting of fire suppression,[1] telemetry, dispatch, and arson investigation personnel (the "Vela Plaintiffs"). The Vela Plaintiffs filed suit against the City of Houston (the "City") in state court on October 25, 1995 claiming they were entitled to overtime pay under state law and under the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 201 et seq. (1998). On October 17, 1997, the City removed the suit to the United States District Court for the Southern District of Texas. The district court entered partial summary judgment in favor of the Vela Plaintiffs on September 24, 1998. The district court did not award any specific amounts for unpaid overtime at that time, but an Agreed Partial Summary Judgment, entered on May 28, 1999, awarded $5,489,590.62 to the telemetry, dispatch, and arson investigation personnel – i.e., all the Vela Plaintiffs except the fire suppression personnel. The fire suppression personnel (including the Daley Plaintiffs) were later paid $4,436,819.12 as a "settlement."[2]

On April 5, 1999, the Daley Plaintiffs filed a separate suit in the district court claiming they were not fire protection employees for purposes of the FLSA. On August 5, 1999, this suit was consolidated with the prior suit brought by the Vela

---

[1] The paramedics and EMTs (including the Daley Plaintiffs) were classified as fire suppression personnel in the Vela suit.

[2] The City denies that there was a settlement but concedes that payment was made.

3

Plaintiffs.  The parties completed discovery with respect to the claims raised by the Daley Plaintiffs on November 30, 1999.  The City and the Daley Plaintiffs then filed cross-summary judgment motions.  In their summary judgment motion, the Daley Plaintiffs argued that as non-fire protection personnel, they are subject to the standard forty-hour workweek under § 207(a)(1) of the FLSA,[3] and thus entitled to overtime compensation in addition to that awarded the Vela Plaintiffs under state law.[4]  The City countered in its summary judgment motion that, pursuant to § 207(k) of the FLSA,[5] the Daley Plaintiffs are exempt from overtime compensation

---

[3]    Section 207(a)(1) of the FLSA states:
    Except as otherwise provided in this section,
    no employer shall employ any of his employees
    who in any workweek is engaged in commerce or
    in the production of goods for commerce, or
    is employed in an enterprise engaged in
    commerce or in the production of goods for
    commerce, for a workweek longer than forty
    hours unless such employee receives
    compensation for his employment in excess of
    the hours above specified at a rate not less
    than one and one-half times the regular rate
    at which he is employed.
29 U.S.C. § 207(a)(1).

[4]    Under state law, as fire suppression personnel, the Daley Plaintiffs were eligible for overtime only after working in excess of 46.7 hours in a workweek.  See Tex. Local Gov't Code Ann. § 142.0017(b) (Supp. 1999).

[5]    Section 207(k) states:
    No public agency shall be deemed to have
    violated subsection (a) of this section with
    respect to the employment of any employee in
    fire protection activities . . . if –
        (1) in a work period of 28 consecutive
        days the employee receives for tours of
        duty which in the aggregate exceed the

4

under the FLSA until they exceed an average of fifty-three hours

of work in a week.  <u>See</u> 29 C.F.R. § 553.201(a).[6]  Alternatively,

---

lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in a work period of 28 consecutive days in calendar year 1975; or
(2) in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive days in his work period as 216 hours (or, if lower, the number of hours referred to in clause (b) of paragraph (1)) bears to 28 days,

compensation at a rate not less than one and one-half times the regular rate at which he is employed.

[6]  A Department of Labor regulation states:
Section 7(k) of the [FLSA] provides a partial overtime pay exemption for fire protection . . . personnel . . . who are employed by public agencies on a work period basis.  This section of the [FLSA] formerly permitted public agencies to pay overtime compensation to such employees in work periods of 28 consecutive days only after 216 hours of work.  . . . [T]he 216-hour standard has been replaced, pursuant to the study mandated by the statute, by 212 hours for fire protection employees . . . .  In the case of such employees who have a work period of at least 7 but less that 28 consecutive days, overtime compensation is required when the ratio of the number of hours worked to the number of days in the work period exceeds the ratio of 212 . . . hours to 28 days.
29 C.F.R. § 553.201(a).  In conjunction with § 207(k) of the FLSA, this regulation establishes that fire protection employees

the City argued that the Daley Plaintiffs are exempt from the general rule providing overtime compensation for hours worked in excess of the standard forty-hour workweek under either the Learned Professional exemption[7] or the Executive/Administrative exemption.[8]

What the City has not argued bears mention.  Although the City contests whether there was in fact a settlement with the Vela Plaintiffs, see infra Part V, conspicuously absent from the City's arguments in the district court and on appeal is an alternative argument that the amount paid by the City to the Vela Plaintiffs was intended to settle the Daley Plaintiffs' claim for overtime compensation under the FLSA.  In response to a specific question at oral argument about the res judicata effect of any settlement on the Daley Plaintiffs' FLSA claim, the City acknowledged that any such argument had been waived.

The district court entered partial summary judgment in favor of the City on March 22, 2000, finding that the Daley Plaintiffs are fire protection employees under the FLSA and therefore not

---

are exempt from overtime compensation under the FLSA until they exceed an average of fifty-three hours of work in a week.

[7]   The FLSA provides that any employee "employed in a bona fide . . . professional capacity" is exempt from the general rule requiring overtime compensation.  29 U.S.C. § 213(a)(1) (1998) (the "Learned Professional exemption").

[8]   The FLSA provides that any employee "employed in a bona fide executive [or] administrative . . . capacity" is exempt from the general rule requiring overtime compensation.  29 U.S.C. § 213(a)(1) (the "Executive/Administrative exemption").

eligible for additional overtime under § 207(a)(1).  Although the parties' motions for summary judgment address the Learned Professional and Executive/Administrative exemptions, the district court's opinion was not required to, and did not, decide whether the Daley Plaintiffs fall within those exemptions.  In this appeal, the Daley Plaintiffs request that this court vacate the district court's order granting summary judgment in favor of the City and render judgment in favor of the Daley Plaintiffs.  The City cross-appeals from the district court's award of attorney's fees to the Vela Plaintiffs.  In addition, the City cross-appeals three issues from the Vela Plaintiffs' case: (1) the district court's order directing the City to pay damages for wages between January 1, 1997 and May 28, 1997 to the fire suppression personnel; (2) the district court's conclusion that overtime for the fire suppression personnel should be calculated on an eighty-hour work cycle; and (3) the district court's conclusion that the City improperly worked dispatch and arson personnel on an eight-day work cycle.

## II.  Summary Judgment Standard of Review

We review a grant of summary judgment de novo, applying the same standard as the district court.  See Chaney v. New Orleans Pub. Facility Mgmt., Inc., 179 F.3d 164, 167 (5th Cir. 1999).  Summary judgment is proper when "there is no genuine issue as to

7

any material fact and [] the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). While we view the evidence in a light most favorable to the non-movant, see Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 533 (5th Cir. 1997), in order to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial, see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

If the evidence is such that a reasonable jury could return a verdict for the non-movant, there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, if the non-movant fails to present facts sufficient to support an essential element of his claim, summary judgment is appropriate. See Celotex, 477 U.S. at 322-23.

**III. The Daley Plaintiffs' Claims for Overtime Compensation**

A. The General Rule of the FLSA and its Exemptions

The FLSA establishes the general rule that all employees must receive overtime compensation for hours worked in excess of forty hours during a seven-day workweek.[9] See 29 U.S.C.

---

[9] State and local government employers do not enjoy constitutional immunity from the FLSA's requirements. See Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985). Garcia overruled Nat'l League of Cities v. Usery, 426 U.S. 833 (1976), a case which held that Congress lacked authority to impose the requirements of the FLSA on state and local governments.

§ 207(a)(1).[10]  Employees are entitled to overtime compensation according to the general rule unless their employer proves that one of the many exemptions applies.  The City asserts that, as EMS workers, the Daley Plaintiffs are not entitled to overtime compensation under the general rule because they fall within three exemptions.  First, employees of a public agency that are engaged in fire protection activities are exempt from the general rule (the "§ 207(k) exemption").  29 U.S.C. § 207(k).[11]  To receive overtime compensation under the FLSA, fire protection employees must work more than 212 hours during a work period of 28 consecutive days, equivalent to an average of 53 hours per week.  See 29 U.S.C. § 207(k); 29 C.F.R. § 553.201(a).[12]  As part of its argument that the Daley Plaintiffs fall within the § 207(k) exemption, the City asserts that § 203(y), a recently enacted statute that defines "employee in fire protection activities," applies retroactively to bar the Daley Plaintiffs' claims.  See 29 U.S.C. § 203(y) (Supp. 2001).   The second and third exemptions that the City relies on are the Learned Professional exemption and the Executive/Administrative exemption.  We construe exemptions from the FLSA narrowly, see Blackmon v. Brookshire Grocery Co., 835 F.2d 1135, 1137 (5th Cir.

---

[10]   See supra note 3 for the text of 29 U.S.C. § 207(a)(1).

[11]   See supra note 5 for the text of 29 U.S.C. § 207(k).

[12]   See supra note 6 for the text of 29 C.F.R. § 553.201(a).

1988), and the employer has the burden to prove that the employee is exempt from the FLSA general rule, see Heidtman v. County of El Paso, 171 F.3d 1038, 1042 (5th Cir. 1999).

In this part of the opinion, we look first to the question whether the Daley Plaintiffs fall within the § 207(k) exemption as it existed at the time their claims accrued. We then turn to the question whether § 203(y) is retroactive. Next, we determine whether the Daley Plaintiffs fall within the Learned Professional and Executive/Administrative exemptions. Finally, we address the City's statute of limitations defense.

## B. Do the Daley Plaintiffs Fall Within the § 207(k) Exemption?

The Daley Plaintiffs are employed by the City of Houston Fire Department and undergo training with firefighters. In fact, some of the Daley Plaintiffs occasionally work as firefighters. As EMS workers, however, they spend approximately 83% of their time responding to what are purely medical calls, unassociated with any firefighting or law enforcement activity. The City's EMS employees are called to respond to less than 1% of the City's fires. Nevertheless, the City argues that the Daley Plaintiffs are exempt from the FLSA general rule providing overtime compensation for hours worked in excess of the standard forty-hour workweek because they are "employee[s] in fire protection activities" under the § 207(k) exemption. The Daley Plaintiffs counter that they do not fall within the § 207(k) exemption because they do not satisfy the requirements for that exemption

10

set out in the related Department of Labor ("DOL") regulations. The district court granted summary judgment to the City and found that the Daley Plaintiffs fall within the § 207(k) exemption and are therefore not entitled to overtime compensation for hours worked in excess of the standard forty-hour workweek established by the FLSA.

We must decide whether the § 207(k) exemption covers the City's EMS employees. To help in our determination, we turn to the DOL regulations under the FLSA because they "constitute a body of experience and informed judgment to which courts . . . may properly resort for guidance." Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). This court must defer to these DOL regulations if (as all parties implicitly concede) they are "based on a permissible construction of the statute." Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

C. The DOL Regulations

In 1987, the DOL issued regulations concerning the application of the FLSA to public employees, see 29 C.F.R. Part 553, and devoted a subpart to "Fire Protection and Law Enforcement Employees of Public Agencies" and the nature of the § 207(k) exemption, id. at Subpart C. The DOL regulations begin by defining "employee . . . in fire protection activities" as:

> any employee (1) who is employed by an
> organized fire department or fire protection
> district; (2) who has been trained to the

11

extent required by State statute or local ordinance; (3) who has the legal authority and responsibility to engage in the prevention, control or extinguishment of a fire of any type; and (4) who performs activities which are required for, and directly concerned with, the prevention, control or extinguishment of fires, including such incidental non-firefighting functions as housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards. The term would include all such employees, regardless of their status as "trainee," "probationary," or "permanent," or of their particular specialty or job title (e.g., firefighter, engineer, hose or ladder operator, fire specialist, fire inspector, lieutenant, captain, inspector, fire marshal, battalion chief, deputy chief, or chief), and regardless of their assignment to support activities of the type described in paragraph (c) of this section, whether or not such assignment is for training or familiarization purposes, or for reasons of illness, injury or infirmity. The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities. See § 553.215.

29 C.F.R. § 553.210(a). The first part of this regulation is commonly referred to as the § 553.210(a) four-part test.[13] The

---

[13] On its face, at least, the four-part test applies to standard firefighters rather than EMS workers. See Justice v. Metro. Gov't of Nashville, 4 F.3d 1387, 1394 (6th Cir. 1993) (noting that the § 553.210(a) four-part test "describe[s] the standard firefighter and do[es] not apply to rescue and ambulance service personnel at all"). A recent DOL letter opinion, however, suggests that certain EMS workers are subject to the § 553.210(a) four-part test as well as the § 553.215 two-part test:

> We have concluded that firefighters who are cross-trained as EMS employees qualify for exemption under [§ 207(k)] as fire protection employees where they are principally engaged

12

last full sentence of this regulation exempts EMS workers who form an "integral part" of an agency's fire protection activities (the "integral part" test). This sentence is followed by an explicit cross-reference to § 553.215 of the regulations. According to § 553.215:

> Ambulance and rescue service employees of a public agency other than a fire protection or law enforcement agency may be treated as employees engaged in fire protection or law enforcement activities . . . if their services are substantially related to firefighting or law enforcement activities in that (1) the ambulance and rescue service employees have received training in the rescue of fire, crime, and accident victims . . ., and (2) the ambulance and rescue service employees are regularly dispatched to fires, crime scenes, riots, natural disasters and accidents.

29 C.F.R. § 553.215. This regulation is commonly referred to as the § 553.215 two-part test.

---

> as firefighters meeting the four tests outlined in [§ 553.210(a)] and where the EMS functions they perform meet the tests described in [§ 553.215] for ambulance and rescue employees.

Wage & Hour Division, U.S. Department of Labor, Opinion Letter, Feb. 13, 1995 (emphasis added). We must defer to the DOL's interpretation of its FLSA regulations unless the interpretation is "plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997) (citations omitted). However, because the § 553.215 two-part test determines the outcome of this case, and because the DOL's letter ruling requires exempt dual-function EMS/firefighters to satisfy both the § 553.210(a) four-part test and the § 553.215 two-part test, we need not decide whether the four-part test applies and must be satisfied here. The fact that the Daley Plaintiffs fail one prong of the § 553.215 two-part test (see discussion infra Part III(E)) is sufficient to establish that they do not fall within the § 207(k) exemption.

We address first the relationship between the last sentence of § 553.210(a), i.e., the "integral part" test, and the § 553.215 two-part test. For reasons discussed below, we find that the "integral part" standard of § 553.210 is best understood by looking to the two-part test of § 553.215. Next, we apply the two-part test of § 553.215 to the Daley Plaintiffs. Because we conclude that the Daley Plaintiffs fail the § 553.215 two-part test, we find that they do not fall within the § 207(k) exemption.

D. The § 553.210(a) "Integral Part" Test Versus The § 553.215 Two-Part Test

The relationship between the last sentence of § 553.210(a), i.e., the "integral part" standard, and § 553.215 is a point of contention among circuit courts. One circuit holds that either the "integral part" test or the § 553.215 two-part test applies, depending on the employment status of the EMS employee. Other circuits insist that the two tests are indistinguishable or that the § 553.215 test is merely a definition of "integral part." The disagreement stems from the language at the beginning of § 553.215 stating that the section applies to "[a]mbulance and rescue service employees of a public agency other than a fire protection or law enforcement agency."

At first glance, the "integral part" standard appears to apply to employees of an "organized fire department or fire protection district," while the two-part test applies only to

14

employees of a "public agency other than a fire protection . . . agency." See 29 C.F.R. §§ 553.210(a) and 553.215. The Eleventh Circuit has adopted this reading of the regulations. See Falken v. Glynn County, 197 F.3d 1341, 1346-47 (11th Cir. 1999) (noting the existence of two distinct standards, one for employees of the fire department and the other for employees of an agency separate from the fire department). The Sixth, Seventh, and Eighth Circuits, however, view the two-part test of § 553.215 as the definition of the phrase "integral part" found in § 553.210(a). See Justice, 4 F.3d at 1395 (holding that "'integral part' is best understood by looking to the two-part test announced in Section 553.215"); Alex v. City of Chicago, 29 F.3d 1235, 1241 (7th Cir. 1994) (holding that § 553.215 states the "one test for the [§ 207(k)] exempt status of publicly employed emergency medical personnel"); Lang v. City of Omaha, 186 F.3d 1035, 1037 n.3 (8th Cir. 1999) (holding that "section 553.215 can be applied to paramedics employed by fire departments").

We now adopt the interpretation of the Sixth, Seventh, and Eighth Circuits. We find that the "integral part" standard of § 553.210(a) is best understood by looking to the two-part test of § 553.215. We do so, in part, because we are guided by this court's opinion in Bond v. City of Jackson. 939 F.2d 285 (5th Cir. 1991). Bond is the only Fifth Circuit case to address whether EMS workers fall within the § 207(k) exemption. In Bond, EMS employees of a city fire department sued the city of Jackson

15

for incorrectly classifying them as employees engaged in fire protection activities within the meaning of the § 207(k) exemption. Because of the classification, the city of Jackson refused to compensate the EMS employees for overtime for all hours worked in excess of forty per week. Although the court's opinion in Bond did not explicitly discuss the issue, the court applied § 553.215 to determine whether EMS workers employed by a fire department fell within the § 207(k) exemption. 939 F.2d at 287-88. Because the EMS workers in Bond received the requisite training, spent most of their time responding to accidents, and co-responded with firefighters to 90% of the EMS calls, we found that the EMS workers satisfied the § 553.215 two-part test. Id. The court's analysis in Bond suggests that the "integral part" standard of § 553.210(a) is best understood by looking to the two-part test of § 553.215.

The conclusion that the two-part test of § 553.215 is the appropriate test for EMS workers from any public agency gives meaning to the cross-reference to § 553.215 found in § 553.210(a) and thereby avoids rendering the cross-reference superfluous or meaningless. For these reasons,[14] we find that the regulations

---

[14] Our conclusion finds some support in the scant legislative history of the § 207(k) exemption, consisting of one brief exchange on the floor of the House of Representatives, which suggests that Congress intended no distinction between personnel connected with a fire department and those connected with some other department. Representative Quie states that this exemption "is intended to cover those employees directly employed by a public agency who are engaged in rescue or ambulance

16

announce only one test (outside of the possible application of the four-part test of § 553.210(a)) for determining the exempt status of publicly employed EMS workers: the two-part test of § 553.215.[15]

## E.  Application of the § 553.215 Two-Part Test

We turn, then, to the application of the § 553.215 two-part test to the Daley Plaintiffs.  Under § 553.215, in order to be exempt from the overtime compensation provisions of the FLSA, an EMS employee: (1) must have "received training in the rescue of fire, crime, and accident victims" and (2) must be "regularly dispatched to fires, crime scenes, riots, natural disasters and accidents."  29 C.F.R. § 553.215.  We examine the second prong, the regularity prong, first and find that the Daley Plaintiffs are not "regularly dispatched" as required by § 553.215 and thus do not fall within the § 207(k) exemption.

The DOL states that "[t]here is no specific frequency of occurrence which establishes 'regularity'; it must be determined on the basis of the facts of each case."  Wage & Hour Division, U.S. Department of Labor, Opinion Letter, Oct. 9, 1987 [hereinafter "DOL Op. Let., Oct. 9, 1987"].  This court has held

---

activities which are substantially related to fire protection or law enforcement activities."  120 CONG. REC. 8598 (1974).  This statement contains the "substantially related" language of § 553.215 and suggests that all EMS workers should be treated similarly under the § 207(k) exemption.

[15]   We need not consider the application of the § 553.210(a) four-part test to these facts.  See supra note 13.

that regularity is easily established when "the EMS ambulances co-respond with one or more other units from the fire department" in "over ninety percent of the EMS calls." Bond, 939 F.2d at 288. In fact, the plaintiffs in Bond testified that they spent most of their time responding to accidents, a type of § 553.215 emergency. Id. While Bond provides a clear example of regularity required by the second prong of the § 553.215 test, no Fifth Circuit case establishes the minimum requirements necessary to satisfy that prong.

In Roy v. County of Lexington, 141 F.3d 533 (4th Cir. 1998), the Fourth Circuit construed "regularity" to require only "some frequency." Id. at 541. The Roy court recognized that this flexible standard "provides only limited assistance to trial courts" but felt constrained by "the flexible approach set forth in the regulations." Id. That court suggested that regularity is best shown with "evidence that numerous EMS calls were dispatched to § 553.215 emergencies and (or) evidence that many fire or police dispatches include EMS teams." Id.

The Eleventh Circuit takes a more rigorous approach and has established specific guidelines for the regularity analysis. According to Eleventh Circuit jurisprudence, when determining whether dispatches to § 553.215 emergencies, i.e. fires, crimes, riots, natural disasters, and car accidents, are regular, the court should consider three factors: (1) the percentage of total calls that are dispatches to § 553.215 emergencies, (2) the

18

percentage of EMS man-hours spent responding to such dispatches, and (3) the percentage of the total number of all calls involving § 553.215 emergencies to which the EMS is dispatched (the "O'Neal factors"). See O'Neal v. Barrow County Bd. of Comm'rs, 980 F.2d 674, 679 (11th Cir. 1993). We agree with the Eleventh Circuit that the regularity analysis should be guided by the three O'Neal factors. While evidence under all three O'Neal factors is preferable, it is not required in every case.

In this case, the Daley Plaintiffs present evidence regarding regularity through deposition testimony from Wes Warnke, Assistant Chief in charge of EMS, and William Barry, a District Chief in the EMS Division. This evidence shows that for the years 1996, 1997, and 1998, only 17% of EMS dispatches were related to § 553.215 emergencies. The other 83% of EMS dispatches corresponded to solely medical or health-related incidents. This evidence, called for by the first O'Neal factor, suggests that the Daley Plaintiffs are not regularly dispatched to § 553.215 emergencies.

Unfortunately, neither party produces the evidence suggested by the second and third O'Neal factors: the percentage of EMS man-hours spent responding to dispatches to § 553.215 emergencies and the percentage of the total number of all calls involving § 553.215 emergencies to which the EMS is dispatched. The Daley Plaintiffs establish that ambulances were dispatched to less than

19

1% of all fire calls in 1995, 1996, and 1997.[16]  This evidence is relevant to our regularity analysis but not as helpful as evidence establishing the percentage of all § 553.215 emergency calls responded to by the Daley Plaintiffs.

The City attempts to establish regularity with evidence showing that from 1996 to 1999 EMS workers responded to 64,435 crime scenes (assaults, gunshot wounds, rapes, stab wounds, hangings, overdoses, and other incidents) and 101,060 accidents (motorcycle and motor vehicle incidents).  Although this evidence constitutes one part of the calculation contemplated by the third O'Neal factor, we find it unhelpful in the absence of evidence of the total number of crime scenes and accidents.  The number of EMS responses, standing alone, does not indicate regularity.  As indicated by the third O'Neal factor, regularity is best demonstrated by showing the number of responses relative to the total number of incidents.

Although we lack the evidence suggested by the second and third O'Neal factors, we need not remand this case.  The parties finished full discovery on these issues on November 30, 1999, and neither party argues that this case presents any genuine issue of material fact.  Rather, each party asserts that it is entitled to

---

[16]  According to Warnke's deposition testimony, multiple alarm fires are the only fire incidents to which EMS workers are regularly dispatched.  Because multiple alarm fires are very rare relative to other fire incidents, ambulances were dispatched to less than 1% of all fire calls in 1995, 1996, and 1997.

judgment on this record as a matter of law.  In circumstances such as these where the factual record is effectively conceded to be complete, remand is unnecessary.  We find that the evidence presented under the first O'Neal factor, i.e., that only 17% of EMS dispatches were related to § 553.215 emergencies, is sufficient for us to determine on this record that the Daley Plaintiffs are not regularly dispatched to § 553.215 emergencies as a matter of law.[17]

This conclusion is supported by other courts, which have found a lack of sufficient regularity in circumstances of even greater regularity than presented by this case.  For example, the Sixth Circuit found that regularity had not been established in a case brought by EMS workers employed by the city of Nashville. Justice, 4 F.3d at 1387.  In Justice, the EMS workers transported 6,733 victims from accidents and responded to 120 fire calls, 1,650 crime scene calls, and 8,943 general medical illness calls between March 15, 1990 and December 31, 1990.  Id. at 1398. Thus, 48.7% of all EMS calls were to § 553.215 emergencies.  In view of these facts, the district court concluded that the EMS

---

[17]  In situations involving cross-motions for summary judgment and upon finding no genuine issues of material fact, this court regularly reverses grants of summary judgment and enters judgment for the opposite party.  See, e.g., Owsley v. San Antonio Indep. Sch. Dist., 187 F.3d 521 (5th Cir. 1999) (concluding that athletic trainers are professionals and thus are exempt from the FLSA's overtime benefits requirements, reversing summary judgment in favor of the trainers, and rendering judgment in favor of their employer).

workers were regularly dispatched.  Id.  Nevertheless, the Sixth Circuit reversed the district court's decision and remanded for further consideration after concluding that "these facts are insufficient to resolve this [regularity] issue."  Id.

In Roy, EMS workers brought an action against Lexington County for overtime compensation.  141 F.3d at 533.  In that case, 25% of EMS calls were executed in conjunction with law enforcement services and 5% were executed in conjunction with fire protection services.  Id. at 541.  Thus, roughly 70% of EMS calls were purely medical and only 30% of all calls were to § 553.215 emergencies.  Id.  Confronted with these facts, the district court found a lack of regularity, and the Fourth Circuit affirmed this determination.  Id. at 542.  In the instant case, only 17% of all EMS calls were to § 553.215 emergencies during the relevant time period, a percentage much lower than that encountered in either Justice or Roy.

Because the § 553.215 two-part test requires that employees satisfy both prongs of the test in order to be exempt, and because we find that the Daley Plaintiffs fail to satisfy the regularity prong on this record as a matter of law, we need not consider whether the EMS workers "have received training in the rescue of fire, crime, and accident victims" sufficient to satisfy the first prong of the test.  The failure to satisfy the regularity prong ensures that the City's employees are not exempt

22

under § 207(k) from the general overtime provisions of the

FLSA.[18]

F. The Retroactivity of § 203(y)

As part of its argument that the Daley Plaintiffs fall

within the § 207(k) exemption, the City asserts that § 203(y), a

recently enacted statute that defines "employee in fire

protection activities," applies retroactively to bar the Daley

Plaintiffs' claims. We disagree.

On December 9, 1999, Congress amended the FLSA by adding a

definition of "employee in fire protection activities." Section

203(y) of the FLSA now states:

> "Employee in fire protection activities"
> means an employee, including a firefighter,
> paramedic, emergency medical technician,
> rescue worker, ambulance personnel, or
> hazardous materials worker, who-
> (1) is trained in fire suppression, has the
> legal authority and responsibility to engage
> in fire suppression, and is employed by a

---

[18] Courts often consider 29 C.F.R. § 553.212 when resolving disputes concerning the § 207(k) exemption. According to § 553.212, even if an EMS worker satisfies the § 553.215 two-part test, he can still qualify for overtime compensation under the forty-hour standard if he spends more than 20% of his working time in nonexempt activities (the "80/20 Rule"). Several courts have awarded overtime compensation to EMS workers based on the 80/20 Rule. See, e.g., West v. Anne Arundel County, 137 F.3d 752, 761 (4th Cir. 1998) (awarding overtime compensation to EMS workers who spent more than 20% of their time performing medical services); O'Neal, 980 F.2d at 681 (granting overtime compensation because the majority of the employees' working hours were spent in nonexempt work such as responding to calls unrelated to fire protection or law enforcement). Because we have already determined that the Daley Plaintiffs fail the § 553.215 two-part test, we need not decide if they spend more than 20% of their working time in nonexempt activities.

23

> fire department of a municipality, county,
> fire district, or State; and
> (2) is engaged in the prevention, control,
> and extinguishment of fires or response to
> emergency situations where life, property, or
> the environment is at risk.

29 U.S.C. § 203(y) (Supp. 2001).  The Daley Plaintiffs' claims accrued before Congress enacted this definition.  Thus, we must determine if this definition applies retroactively.

Generally, we disfavor the retroactive application of new laws.  See U.S. Fid. & Guar. Co. v. McKeithen, 226 F.3d 412, 418 (5th Cir. 2000).  Retroactive legislation can create "severe problems of unfairness because it can upset legitimate expectations and settled transactions."  Id.  Although in many situations a court should "apply the law in effect at the time it renders its decision," Bradley v. Sch. Bd. of the City of Richmond, 416 U.S. 696, 711 (1974), those situations "generally involve procedural changes to existing law, including statutes which merely alter jurisdiction." Hartford Cas. Ins. Co. v. F.D.I.C., 21 F.3d 696, 700 (5th Cir. 1994).  This court follows the two-part analysis governing the retroactivity of new statutes delineated by the Supreme Court in Landgraf v. USI Film Prods., 511 U.S. 244, 280 (1994).  See, e.g., Graham v. Johnson, 168 F.3d 762, 781-88 (5th Cir. 1999); United States v. Rocha, 109 F.3d 225, 228-29 (5th Cir. 1997).

First, we ask "whether Congress has expressly prescribed the statute's proper reach."  Landgraf, 511 U.S. at 280.  The stated

24

purpose of § 203(y) is to "clarify the overtime exemption for employees engaged in fire protection activities."  Pub. L. No. 106-151, 113 Stat. 1731 (codified as amended at 29 U.S.C. § 203(y)) (the "Amendment").  The text of the Amendment does not mention retroactivity.  Furthermore, the legislative history of § 203(y) does not suggest that it was intended to apply retroactively.  See 145 CONG. REC. H11,499-02 (daily ed. Nov. 4, 1999); H.R. REP. NO. 106-1040, at 102 (2001); S. REP. NO. 107-11, at 18 (2001).  Therefore, we find that Congress has not expressly made § 203(y) of the FLSA retroactive.

The City argues that a portion of the legislative history, consisting of a brief exchange on the floor of the House of Representatives, clearly shows that § 203(y) was enacted to specifically preclude such claims as the Daley Plaintiffs assert in this case.  During congressional debates, Representative Boehner observed:

> Many State and local governments employ EMS personnel who receive training and work schedules and maintain levels of preparedness which is very similar to that of firefighters.  In the past, these types of employees fit within the 7(k) overtime exemption.
> In recent years, however, some courts have narrowly interpreted the 7(k) exemption and held that emergency medical services personnel do not come within the exemption because the bulk of their time is spent engaged in nonfire protection activities. These lawsuits have resulted in State and local governments being liable for millions of dollars in back pay, attorneys' fees and court costs.

25

> So there is a real need to modernize this area of the Fair Labor Standards Act and to clearly specify who can be considered a fire protection employee for purposes of the exemption.

145 CONG. REC. at *H11500 (statement of Rep. Boehner). The sponsor of the new § 203(y), Representative Ehlich, further explained:

> [F]rom its inception, the Fair Labor Standards Act has exempted fire protection employees from the traditional 40-hour workweek. Historically, any emergency responder paid by a fire department was considered to be a fire protection employee. However, recent court interpretations of Federal labor statutes have rendered this definition unclear. [Section 203(y)] seeks to clarify the definition of a fire protection employee.

Id. (statement of Rep. Ehlich). Contrary to the City's assertions, nothing in those statements makes clear a congressional intent to impair rights that existed and accrued prior to the passage of § 203(y). The Supreme Court has explained that inferences of retroactivity like those made by the City are unreliable:

> It will frequently be true . . . that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity. Statutes are seldom crafted to pursue a single goal, and compromises necessary to their enactment may require adopting means other than those that would most effectively pursue the main goal. A legislator who supported a prospective statute might reasonably oppose retroactive application of the same statute.

26

Landgraf, 511 U.S. at 285-86. Thus, neither the language nor the legislative history of § 203(y) expressly states that Congress intended it to apply retroactively.

According to Landgraf, next we ask whether § 203(y) "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." 511 U.S. at 280. Unlike the pre-amendment statutory scheme, § 203(y) explicitly covers a broad class of employees, including paramedics, emergency medical technicians, rescue workers, and ambulance personnel. Moreover, § 203(y) dispenses with the rescue training and regularity requirements for exemption of EMS workers under the pre-amendment regulations. Thus, under the current FLSA, more employees fall within the § 207(k) exemption, and fewer employees are entitled to overtime compensation pursuant to the FLSA general rule. If applied retroactively, this broadening of the exemption would impair the Daley Plaintiffs' rights to overtime compensation that accrued before Congress enacted § 203(y).[19] Because (1) Congress did not expressly make § 203(y) retroactive, and (2) retroactive application of § 203(y) here would impair the rights of the Daley Plaintiffs, we refuse to give § 203(y) retroactive effect.

_____

[19] We need not determine whether the Daley Plaintiffs would be exempt fire protection employees under § 203(y). It is enough to note that the retroactive application of § 203(y) would impair the Daley Plaintiffs' rights by making it much more difficult for them to prevail.

27

G.  The Learned Professional Exemption

In addition to the § 207(k) exemption, the City argues that the Daley Plaintiffs fall within the Learned Professional exemption.[20]  The FLSA provides that any employee "employed in a bona fide . . . professional capacity" is exempt from the general rule requiring overtime compensation.  29 U.S.C. § 213(a)(1). DOL regulations define "employee employed in a bona fide . . . professional capacity" as:

> any employee:
> (a) Whose primary duty consists of the performance of:
>     (1) Work requiring knowledge of an advance type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, . . . and
> (b) Whose work requires the consistent exercise of discretion and judgment in its performance.

29 C.F.R. § 541.3.  This definition consists of two prongs: the education prong and the discretion prong.  If an employer proves that his employee satisfies both prongs, the employee is not entitled to overtime compensation because he falls within the

---

[20]  Although the district court did not decide whether the Daley Plaintiffs fall within either the Learned Professional exemption or the Executive/Administrative exemption, the parties' summary judgment motions raise the applicability of these exemptions.  Because the parties have finished discovery, and the record on these issues is complete, we can decide the applicability of these two exemptions.

Learned Professional exemption.  The City fails to show that the Daley Plaintiffs satisfy either prong of this exemption.

First, the Daley Plaintiffs lack the educational background to satisfy the education prong of the Learned Professional exemption.  DOL regulations note that "[t]he typical symbol of the [required] professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree."  29 C.F.R. § 541.301(e)(1).  City regulations do not require a college degree to qualify as a paramedic or EMT. The Department requires EMTs to complete only 200 hours of didactic training, clinical experience, and field internship and requires paramedics to complete only 880 hours of specialized training in didactic courses, clinical experience, and field internship.  The only court to directly address this issue held that requirements such as these were insufficient to meet the education prong.  See Quirk v. Balt. County, 895 F. Supp. 773 (D.Md. 1995).  In Quirk, the court ruled that, unlike nurses who must complete three academic years of study in an accredited college plus a fourth year of professional course work in a school of medical technology, paramedics, the highest level EMT, did not have the necessary education to be "learned professionals" under the regulations because they were only required to achieve 600 hours of classroom and field training. Id. at 785.

29

Although no Fifth Circuit case analyzes whether these EMT/paramedic requirements satisfy the education prong of the Learned Professional exemption, we applied the exemption in Owsley v. San Antonio Indep. Sch. Dist., 187 F.3d 521 (5th Cir. 1999). The court held that athletic trainers are "learned professionals" exempt from the FLSA overtime compensation provisions. Id. at 527. The court found that the trainers satisfied the education prong because they were required to achieve, at a minimum, the following: (1) a bachelor's degree in any field; (2) 1800 hours apprenticeship over a three-year period; (3) completion of five 3-hour credit college courses in specific areas of study; and (4) a C.P.R. test. Id. at 524-25. The Owsley panel analogized the trainers' educational training and background to those of airline pilots who, while lacking the requirement of a college degree, were required to "complete a course of instruction to learn the regulations governing pilots, basic aerodynamic and flight principles, and numerous airplane operations." Id. at 525. The court cited nurses, accountants, and "actuarial computants," as other examples of "learned professionals." Id. In this case, the EMT/paramedic educational requirements are much less rigorous than those required for athletic trainers. Moreover, the educational backgrounds of EMS workers are not as extensive as those of any of the professionals cited as examples by the panel in Owsley. For these reasons, we

find that the Daley Plaintiffs do not satisfy the education prong of the Learned Professional exemption.

Second, the Daley Plaintiffs' jobs lack the consistent exercise of discretion and judgment required to satisfy the discretion prong of the Learned Professional exemption. In the context of discussing the discretion exercised by trainers, the Owsley panel noted that paramedics/EMTs did not exercise the same type of discretionary judgment as trainers "because paramedics work on a daily basis with their supervising physicians under the expectation of physician intervention immediately following emergency treatment." Owsley, 187 F.3d at 527.

In his affidavit, Dr. David Persse, current Director of Emergency Medical Services for the City of Houston, explains the scope of the Daley Plaintiffs' work. Department EMS workers follow either protocols or standing orders at all times. Standing orders apply only when communication with a supervising physician has not been established. According to Persse, these orders "strictly define the actions, techniques, or drug administration that may be implemented" by the EMS workers. Although an EMS employee uses some discretion when selecting which particular standing order to apply, he is not permitted to exercise discretion when acting under a particular standing order. Protocols, on the other hand, are applicable when communication has been established with a supervising physician so that the physician is providing on-line medical direction.

31

These protocols allow for more discretion but require physician supervision to implement.  The medical director, not the EMS workers, is responsible for establishing all protocols and standing orders.  These "highly specific medical protocols" and the direct physician supervision of the EMS workers formed the basis for the distinction made by this court in <u>Owsley</u> when we held that athletic trainers exercised discretion while EMS workers did not.  187 F.3d at 527.

We find that, although the Daley Plaintiffs use a small amount of discretion in their jobs, this discretion is not sufficient to establish "the consistent exercise of discretion and judgment" required by the discretion prong of the Learned Professional exemption.  Thus, the City failed to satisfy its burden of proof on either prong of this exemption. We find that the Daley Plaintiffs do not fall within the Learned Professional exemption as a matter of law.

H.  The Executive/Administrative Exemption

In addition to the § 207(k) exemption and the Learned Professional exemption, the City argues that the Daley Plaintiffs fall within the Executive/Administrative exemption.  The FLSA provides that any employee "employed in a bona fide executive [or] administrative . . . capacity" is exempt from the general rule requiring overtime compensation.  29 U.S.C. § 213(a)(1).  To qualify as a bona fide executive, the employee must satisfy the following requirements:

> (1) The employee is compensated on a salary basis at a rate of not less than $250 per week; and
> (2) The employee's primary duty consists of management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and
> (3) The employee's responsibilities include the customary and regular direction of the work of at least two or more other employees.

29 C.F.R. § 541.1(f). Whether an employee's "primary duty consists of management" is a fact-sensitive inquiry, but "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent of the employee's time." 29 C.F.R. § 541.103. Among other factors to be considered are: (1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which the employee exercises discretionary powers, (3) the employee's relative freedom from supervision, and (4) the relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor. See Quirk, 895 F. Supp. at 786 (citing Shockley v. City of Newport News, 997 F.2d 18, 25-26 (4th Cir. 1993)).

To qualify as a bona fide administrative employee, the employee's primary duty must be the performance of office or non-manual work directly related to management policies or general business operations of his employer, including work requiring the exercise of discretion and independent judgment. See 29 C.F.R. § 541.2. According to DOL regulations, "the exercise of

33

discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.207(a).

The City argues that paramedics and EMTs who hold the rank of captain or higher (collectively the "Managers") are employed in a bona fide executive or administrative capacity.  On this record, we disagree.  The City presented <u>no</u> evidence of the actual job functions of the Managers.  Instead, the City offered the job descriptions for the captain, senior captain, district chief, and deputy chief positions.  Each description contains a disclaimer that states: "Any one position may not include all of the tasks listed, nor do the examples necessarily include all of the tasks performed."  The City presents no affidavits, testimony, or other evidence concerning the actual management duties performed by employees in these three classifications or the time spent on such management duties.  A generic job description tells us nothing about the specific duties of each Manager or what percentage of time was spent on management activities.  Furthermore, a job description does not indicate whether each Manager exercised discretion and if he did, to what extent.

We have previously held that firefighters holding the rank of "district chief" and "battalion chief" were exempt administrative employees.  See <u>Smith v. City of Jackson</u>, 954 F.2d

34

296, 299 (5th Cir. 1992). Similarly, the district court in <u>Quirk</u> held employees holding the rank of "captain" to be exempt executive employees. <u>Quirk</u>, 895 F. Supp. 773, 787-88. In both of these cases, however, the evidence showed that those employees had substantial management duties and exercised great discretion. Here, we have no such evidence. The title of "'captain' provides no guidance on whether the administrative exemption applies; rather, a fact-sensitive inquiry . . . is required." <u>Dep't of Labor v. City of Sapulpa</u>, 30 F.3d 1285, 1288 (10th Cir. 1994). The evidence in this case does not satisfy the City's burden of proving the Executive/Administrative exemption. On the contrary, the utter lack of probative evidence precludes us from holding that the Managers fall within the Executive/Administrative exemption as a matter of law.

## I.  Statute of Limitations

The City's final defense is that the Daley Plaintiffs' claims under the FLSA are barred by the statute of limitations. The City raised this issue for the first and last time in its Original Answer, filed on May 21, 1999, by stating "[a]fter discovery, Defendant may be able to show that part or all of Plaintiffs' claims may be barred by the applicable statute of limitations." This vague statement does not specify the particular statute under which the City planned to bring a limitations defense. Furthermore, the statement does not state with certainty that the City would assert such a defense at all.

35

According to a ruling made at a pre-trial conference held on September 20, 1999, the parties completed discovery with respect to the claims raised by the Daley Plaintiffs on November 30, 1999. Soon thereafter, the Daley Plaintiffs filed for summary judgment, arguing that they were entitled to overtime compensation under the FLSA. The City responded with its own summary judgment motion asserting that the Daley Plaintiffs were not entitled to overtime compensation because of the § 207(k) exemption, the Learned Professional Exemption, and the Executive/Administrative exemption. The City never raised a limitations defense in its motion for summary judgment. Furthermore, on February, 9, 2000, the City filed a Supplemental Answer. This answer further developed two affirmative defenses first asserted in the Original Answer: (1) the failure to state a claim and (2) the exempt status of Plaintiffs under the FLSA.[21] However, the Supplemental Answer did not elaborate on the City's assertion that Plaintiffs' claims may be barred by a statute of limitations.

Generally, on appeal, we do not address issues that were not raised in the lower court. See United States v. Martinez, 228 F.3d 587, 589 n.3 (5th Cir. 2000). Thus, we will not consider the City's statute of limitations defense here. Moreover, because we find that the City waived the limitations defense at

_____

[21] The Supplemental Answer also adds the affirmative defense that Plaintiffs are not entitled to liquidated damages.

the district court level, we need not remand the issue to the district court for further proceedings.

We have held that a party "'in his opposition to a motion for summary judgment cannot abandon an issue and then . . . by drawing on the pleadings resurrect the abandoned issue.'" Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1164 (5th Cir. 1983) (citing Edward B. Marks Music Corp. v. Continental Record Co., 222 F.2d 488, 492 (2d Cir. 1955)).[22]  In Hargrave, the third-party plaintiff, in its initial third-party complaint, asserted three alternative grounds for recovery: alter ego liability, successorship liability, and contribution/indemnity liability. See 710 F.2d at 1163.  When the defendant moved for summary judgment, the plaintiff never raised the theories of successorship liability or contribution/indemnity.  See id. at 1163-64.  In fact, the plaintiff never mentioned before the trial court "a single fact that would trigger a genuine issue on these theories."  Id.  Ultimately, this court found that the plaintiff

---

[22]  See also Stephens v. C.I.T. Group/Equip. Fin., Inc., 955 F.2d 1023, 1026 (5th Cir. 1992) (finding that the defendant waived its limitations defense at the trial court level because "aside from urging a general statute of limitations defense in its answer, [the defendant] never mentioned limitations in the trial court proceedings").  Cf. Teamsters' Steel Haulers Local Union No. 800 v. Lakeshore Motor Freight Co., 484 F. Supp. 925, 929-30 (W.D. Penn. 1979) (holding that "defendants do not waive the statute of limitations defense where it is presented by the pleadings even if excluded from a summary judgment motion).  In Teamsters', the defendants avoided waiver by asserting the limitations defense before the trial court in a petition for reconsideration of the grant of summary judgment.

"abandoned its alternative theories of recovery by failing to present them to the trial court," and we affirmed the trial court's grant of summary judgment in favor of the defendant. Id. at 1164-65.

The facts presented by this case resemble those of Hargrave. The City weakly asserted a possible limitations defense in its Original Answer. When confronted with the Daley Plaintiffs' motion for summary judgment, however, the City never re-asserted its limitations defense. Moreover, the City's Supplemental Answer omitted any mention of a limitations defense. The vague language in the City's Original Answer coupled with the complete absence of the issue in all subsequent documents filed with the district court convinces us that the City abandoned its limitations defense. As the First Circuit noted in Violette v. Smith & Nephew Dyonics, Inc., 62 F.3d 8 (1st Cir. 1995), it is clear in this case that the City's limitations defense "flickered but once, dimly, on the radar screen of this litigation and then disappeared forever." 62 F.3d at 11.

I. Conclusion of FLSA Issues

We find that the Daley Plaintiffs are not exempt from the overtime compensation provisions of the FLSA under the § 207(k) exemption for fire protection employees, the Learned Professional exemption, or the Executive/Administrative exemption. We also find that the City waived its statute of limitations defense. Thus, the Daley Plaintiffs are entitled to overtime compensation

38

for hours worked in excess of forty during a seven-day workweek. See 29 U.S.C. § 207(a)(1).  Accordingly, we REVERSE the district court's judgment and REMAND the case to the district court for a determination of the amount of overtime compensation owed by the City to the Daley Plaintiffs.

## IV.  Attorney's Fees

On July 11, 2000, the district court awarded $2,800,000 in attorney's fees to Troy Blakeney, attorney for the Vela and Daley Plaintiffs.  The City requests that this court reform the attorney's fees to $557,500.  This court reviews the district court's award of attorney's fees for abuse of discretion and its findings of fact supporting the award for clear error.  Strong v. BellSouth Telecomms. Inc., 137 F.3d 844, 850 (5th Cir. 1998). "Under the clearly erroneous standard, [this court] will reverse only if [it has] a definite and firm conviction that a mistake has been committed."  Canal Barge Co., Inc. v. Torco Oil Co., 220 F.3d 370, 375 (5th Cir. 2000).  Both parties stipulate that the Texas Supreme Court's decision in Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812 (Tex. 1997), governs the award of attorney's fees in this case.[23]  In Arthur Andersen, the Texas Supreme Court identified the following factors to be considered

---

[23]  We look to state law in this analysis of attorney's fees because the fees were awarded in the suit instituted by the Vela Plaintiffs.  In that case, the Vela Plaintiffs asserted state law claims for overtime compensation.

when determining the reasonableness of an award of attorney's fees:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
> (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

945 S.W.2d at 818.

Each party submitted an expert report to the district court concerning the proper amount of attorney's fees. The court held a hearing on the issue, and the transcript from that hearing shows that the district court considered the <u>Arthur Andersen</u> factors.[24] Before applying the factors, the district court found

---

[24] The district court described the factors as the <u>Johnson</u> factors, referring to <u>Johnson v. Ga. Highway Express, Inc.</u>, 488 F.2d 714, 717-19 (5th Cir. 1974). We have recently stated that the <u>Johnson</u> factors are "comparable" to the <u>Arthur Andersen</u> factors. <u>See</u> <u>Mid-Continent Cas. Co. v. Chevron Pipe Line Co.</u>, 205 F.3d 222, 232 (5th Cir. 2000).

that "if a contingent fee were to be applied, it would be applied to the approximate ten million dollars for the aggregate recovery," which includes overtime compensation as well as corresponding pension contributions made by the City to Plaintiffs' individual pension accounts.  Regarding this decision, the district judge stated that "[i]n most cases, pension contributions are a substantial part of compensation, and there's no legal or economic logic in treating direct or indirect compensation differently."  While we find no binding authority on point, the federal district court for the Southern District of New York has included pension plan contributions as part of the gross recovery subject to a contingency fee.  See Puerto v. Local One, Amalgamated Lithographers, No. 87 CIV. 7681 (RWS), 1991 WL 33341, at *3 (S.D.N.Y. Mar. 4, 1991).  That court reasoned that "there is no apparent justification for excluding this portion of the settlement, which clearly represented a financial gain for [the plaintiff], from the gross recovery subject to the contingency fee."  Id.  We find the court's reasoning in Puerto persuasive.  Therefore, in this case, the district court's finding that the total recovery includes the pension contributions made by the City to Plaintiffs' individual pension accounts is not clearly erroneous.

The district court separately considered each Arthur Andersen factor at the hearing on attorney's fees.  When considering the first factor, the district court stated that the

41

"time required was substantial" because "the intricacies of each worker's situation had to be identified, specified and, on occasion, clarified."  The court found the novelty and difficulty of the questions involved to be "moderate" and the skill required to be "a high level of managerial lawyering."  More specifically, the district judge found that "[t]he skill in managing the precise factual evaluation of 2600 cases and the skill that [Blakeney] brought to the labyrinth of governmental employee relations law was of the highest order required."  In its brief, the City argues that the legal issues in this case are not complicated.  However, when requesting more money from the City Council to fund the litigation, the City Attorney thrice emphasized the complexity of the litigation "resulting from claims under federal, state and local law, as well as the volume of documents, the unforeseen magnitude of the mechanics of computing the various components of each of the 2600 Plaintiffs' claims and the number of issues involved."

Regarding the second Arthur Andersen factor, the trial court noted that Blakeney was "unable to represent his principal client by reason of his accepting this case."  In the Plaintiffs' fee application, however, Blakeney states that "this factor does not weigh for or against the fee award in this case."  Because of the conflicting evidence, we consider this factor to be a neutral factor.  In applying the third factor, the district court found that Blakeney's 30% contingency fee "is a reasonable rate."  In

fact, the court stated that "a 30 percent contingent fee in labor litigation against the Government is on the low side," and "the customary contingency is likely to have been more like 35 to 40 percent." Pursuant to factor four, the district court considered the large recovery awarded to Blakeney's clients along with "the significance of the dollars to the individuals separately and aggregately."

The district court noted that factors five and six are neutral in this case. Regarding factor seven, the district court stated that "Mr. Blakeney is extensively experienced in his factual field and his legal field and has a reputation commensurate with his experience and his high ability." This is "reflected in what his customary hourly rate, actual or imputed, would be." While considering factor eight, the district court suggested that it is proper for a lawyer on a contingency fee case to estimate his fee per hour to be higher than a lawyer on a fixed fee case. Blakeney's estimate was approximately $100 higher than the fee paid by the City to its attorneys, but this is justified given the risk of receiving no fee at all.

Furthermore, the district court found that the paralegals' work on the case "was of a more complex and tedious nature" than usual. Paralegal work can only be recovered as attorney's fees if the work is legal rather than clerical. See Allen v. U.S. Steel Corp., 665 F.2d 689, 697 (5th Cir. 1982). After considering the expert reports submitted by the parties and

43

Blakeney's testimony at the hearing on attorney's fees, the district court determined that the numerous hours of paralegal work were legal in nature and recoverable as attorney's fees. Nothing in the record suggests that this finding was clearly erroneous. The district court entered an award of $2,800,000 (roughly 30% of the total recovery) as attorney's fees.[25]

The City contends that Blakeney's application for attorney's fees is vague in that it does not "offer any support for the reasonableness of the number of hours claimed by Blakeney for himself, his associates, or for his paralegals and staff." The district court, however, based its award of attorney's fees on the number of hours claimed in Blakeney's fee application. We must accept the factual findings upon which the district court bases its award of attorney's fees, including the determination of the number of hours reasonably expended on the litigation, unless they are clearly erroneous. See La. Power & Light Co. v. Kellstrom, 50 F.3d 319, 324 (5th Cir. 1995). The district court adopted many of the facts from the expert report on attorney's fees submitted by Plaintiffs. The court's decision not to adopt facts from the City's expert opinion does not make the court's findings clearly erroneous. See Brady v. Fort Bend County, 145 F.3d 691, 716 (5th Cir. 1998) (finding no abuse of discretion in

---

[25] This total award included: (1) $2,700,000 for actual fees, calculated using an imputed hourly rate, and (2) $100,000 as a bonus for risk.

44

setting fee award based, in part, on the district court's knowledge of the facts and familiarity with the case and quality of attorneys' work over several years). Given the evidence presented in this case, the district court's findings of fact are not clearly erroneous, and the award of attorney's fees is not an abuse of discretion. Accordingly, we AFFIRM the district court's award of $2,800,000 in attorney's fees.

## V. Remaining Issues Are Moot

On September 24, 1998, the district court entered partial judgment in favor of the Vela Plaintiffs on several specific issues relating to overtime compensation. The parties contest three of those issues: (1) the district court's order directing the City to pay damages for wages between January 1, 1997 and May 28, 1997 to the fire suppression personnel ("Issue 1"); (2) the district court's conclusion that overtime for the fire suppression personnel should be calculated on an eighty-hour work cycle ("Issue 2"); and (3) the district court's conclusion that the City improperly worked dispatch and arson personnel on an eight-day work cycle ("Issue 3"). We find that these three issues are moot because the parties have already settled the underlying claim.

Our jurisprudence dictates that our duty as a court is limited to making decisions on actual controversies. See Oil,

45

Chem. & Atomic Workers Int'l Union v. Missouri, 361 U.S. 363, 367 (1960). We have no power to "give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before [us]." Id. (quoting Mills v. Green, 159 U.S. 651, 653 (1895)). Generally, settlement of a dispute renders moot any case growing out of that dispute. See ITT Rayonier Inc. v. United States, 651 F.2d 343, 345 (5th Cir. 1981). In such a situation, we find the claims moot "even if the parties remain at odds over the particular issue they are litigating." Id. We have repeatedly recognized that settlement between the parties renders an appeal moot and requires dismissal of the issues that have been settled. See, e.g., Oxy USA, Inc. v. Babbitt, 122 F.3d 251, 258 n.12 (5th Cir. 1997); In re Talbott Big Foot, Inc., 924 F.2d 85, 87-88 (5th Cir. 1991).

In this case, the record contains no final judgment ordering the City to pay overtime to the fire suppression personnel. Nonetheless, pursuant to City Council Motion No. 1999 1949, the City paid fire suppression personnel overdue wages for 1997 (Issue 1) and overtime compensation based upon an eighty-hour work cycle (Issue 2). This Motion, approved and adopted on November 9, 1999, states "MOTION by Council Member Boney that the recommendation of the City Attorney, for settlement of the overtime claims . . . be adopted, and settlement of these claims in the total amount of $4,436,819.12 . . . . [is] hereby approved

by the City Council."[26]  With respect to Issue 3, the district

court entered an Agreed Partial Summary Judgment, signed by both

parties and the judge, on May 28, 1999.  The judgment states that

upon payment of "an agreed upon sum" to the individual

plaintiffs, their claims would be dismissed with prejudice.  This

court has stated that it will not entertain an appeal by a party

from an order to which that party agreed.  See Tel-Phonic Servs.,

Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1137 (5th Cir. 1992).

Furthermore, a second City Council motion approved "settlement of

lawsuit . . . in the amount of $5,489,590.62 for overtime damages

. . . ." pursuant to the Agreed Partial Summary Judgment.  Thus,

the City paid the Vela Plaintiffs just under ten million dollars

(plus pension contributions and statutory interest attributable

to that amount) for overtime work.  Given this fact, we find the

City's contention that there was no settlement implausible.  The

two City Council motions refer to a "settlement."  The Agreed

Partial Summary Judgment strongly suggests a settlement.  For

these reasons, we find that Issues 1, 2 and 3 have been settled

---

[26]  The City objects to this court's consideration of the
motion because it is unauthenticated and not in the appellate
record.  This court has stated that it is appropriate for us to
take judicial notice of a city ordinance on appeal even if it was
not introduced into the trial records.  See In re Weller Creek,
Ltd., 867 F.2d 228, 238 n.14 (5th Cir. 1989) (citing United
States v. City of Miami, 664 F.2d 435, 443 n.16 (5th Cir. 1981))
("The power of a federal court to take judicial notice of
legislative facts is less constrained than its power to take
notice of adjudicative facts."); see also ITT Rayonier, 651 F.2d
at 345 n.2 (noting that when a settlement and dismissal is not in
the record, the court may take judicial notice of it).

by the parties.  Therefore, we have no jurisdiction to decide the issues.  See In re Talbott Big Foot, Inc., 924 F.2d at 87-88.

## VI.  Conclusion

For all the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of the City and REMAND for entry of judgment in favor of the Daley Plaintiffs following a determination of the amount of overtime compensation owed by the City to the Daley Plaintiffs.  We AFFIRM the district court's award of attorney's fees to the Vela Plaintiffs.  The costs of this appeal shall be borne by the City.